Opinion issued May 18, 2023



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-21-00285-CV

_____

**GE OIL & GAS PRESSURE CONTROL, L.P., Appellant**

**V.**

**CARRIZO OIL & GAS, INC., Appellee**

---

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-24754**

---

## MEMORANDUM OPINION

This is an insurance subrogation case brought by Gemini Insurance Company in the name of its insured, Carrizo Oil & Gas, Inc. ("Carrizo") against GE Oil & Gas Pressure Control, L.P. ("GE"). GE appeals from a final judgment

awarding appellee Carrizo Oil & Gas, Inc. ("Carrizo") more than $2.5 million in damages on its negligence claim arising from a well blowout.

GE leased and installed equipment for Carrizo (Marcellus) LLC ("Carrizo Marcellus"), a wholly-owned subsidiary of appellee Carrizo, to drill and complete a natural gas well. During the final fracking stage, a blowout occurred, resulting in the release of water, sand, and drilling fluids, and necessitating remediation. Carrizo sued GE and others, alleging negligence, breach of contract, product liability, and breach of warranty. GE counterclaimed, alleging that Carrizo was negligent, and that GE was entitled to indemnification from Carrizo.

In the summer of 2016, the trial court (Judge Mayfield) held a jury trial on liability, and the jury found that both GE and Carrizo were negligent.[1] The jury found against Carrizo on the other claims. The trial court denied Carrizo's motion to disregard the jury's finding that it was negligent. In 2018, the trial court (Judge Hall) conducted the bench trial on GE's indemnity claim. Two years later, the trial court signed findings of fact and conclusions of law. In 2021, the trial court granted Carrizo's renewed motion to disregard the jury's finding that it was negligent and denied GE's request for additional findings of fact and conclusions of law. The court then rendered final judgment denying GE's indemnity claim and awarding Carrizo damages exceeding $2.5 million.

_____

[1] The parties agreed to try the indemnification to the bench after the jury trial on liability, if necessary.

2

On appeal, GE raises three issues challenging: (1) Carrizo's standing to sue for damages sustained by its wholly-owned subsidiary Carrizo Marcellus; (2) the trial court's grant of Carrizo's motion to disregard the jury's verdict; and (3) the trial court's determination that GE was not entitled to indemnity.

We affirm.

## Background

Carrizo is an oil and gas exploration and production company. Its wholly-owned subsidiary, Carrizo Marcellus, owns and operates wells in the Marcellus Shale "play" in Pennsylvania, including the Yarasavage 1H well that experienced the blowout from which this litigation arose.[2]

GE is an oilfield service provider that leases and installs equipment used in drilling and production, including the "frac valve assembly," which is the main valve assembly at the top of a well and which is used during the process of fracturing a well to prepare it for production.[3]

---

[2] A "shale gas play" is a "set of discovered, undiscovered or possible natural gas accumulations that exhibit similar geological characteristics." *See* https://www.energy.gov/sites/prod/files/2013/04/f0/shale_gas_glossary.pdf (last visited May 2, 2023). The Yarasavage 1H well takes its name, Yarasavage, from the name of the owner of the surface estate. Its designation, 1H, refers to the fact that it is the first (1) of several horizontal (H) wells. The Marcellus Shale (and other similar formations) "hold hundreds of trillions of cubic feet of natural gas" that was considered prohibitively expensive to access until innovations in drilling and extraction technology brought it within reach. *See* https://tinyurl.com/y7ah37rr (last visited May 2, 2023).

[3] The frac valve assembly is also called the frac tree assembly.

GE installed the frac valve assembly that was used at Yarasavage 1H. All the equipment, except a gasket in the flange beneath the main valve, was leased; the gasket was sold to Carrizo because it is designed to be used once and replaced after use. After passing a static pressure test upon installation, the frac valve assembly was put into service. After twenty successful fracking stages, the frac valve assembly failed during the twenty-first and final fracking stage. Fracking fluids, water, and sand were expelled from the flange installed beneath the master valve, as shown in this photo admitted at trial:



Carrizo regained control of the well, conducted remediation in accordance with relevant laws and regulations, reported the incident to governmental agencies, and made claims with its insurer, Gemini Insurance Company. Gemini later filed suit on behalf of its insureds, Carrizo and Carrizo Marcellus, and in the name of Carrizo. Although Gemini is the real party in interest, we refer to Carrizo as it is the named plaintiff and appellee.

In its live pleading, Carrizo asserted that the frac valve assembly was improperly installed and that the ring gasket used in the flange beneath the master valve was defective and not within American Petroleum Institute (API) or manufacturer specifications. Carrizo alleged claims against GE for negligence, breach of contract, products liability, and breach of implied and express warranty.

GE generally denied the allegations and asserted counterclaims, including allegations that Carrizo was negligent and was contractually obligated to indemnify GE for its negligence. GE also sought attorney's fees for asserting the indemnity claim.

Carrizo filed an amended pleading adding Carrizo Marcellus as a plaintiff, but the trial court sustained GE's special exceptions and ordered Carrizo Marcellus to file a petition in intervention if it wished to be joined as a plaintiff. Carrizo Marcellus did not file a petition in intervention. GE moved for summary judgment, arguing that because the Yarasavage 1H well was owned and operated by Carrizo

5

Marcellus, Carrizo lacked standing to claim damages from the blowout.[4] GE asserted that Carrizo "ha[d] not been personally aggrieved and therefore lack[ed] standing to sue GE for those damages."

Carrizo responded that both it and Carrizo Marcellus suffered damages and that "all costs and expenses were passed on to and ultimately borne by" Carrizo, as the parent company. Carrizo also argued that Carrizo Marcellus had assigned all its rights to Carrizo and that all damages had been paid by and subrogated to its insurer, Gemini Insurance Company, who was the real party in interest. The trial court denied GE's motion for summary judgment.

Before trial, GE and Carrizo agreed to bifurcate the trial into a jury trial on liability and a later bench trial, if necessary, on GE's counterclaims for indemnification. The jury trial took place over seven days in the summer of 2016. Manufacturing defect, negligence, and breach of contract theories were submitted to the jury. The jury found that a manufacturing defect was not a producing cause of the blowout, and that GE did not fail to comply with its agreement to install the frac valve assembly on the Yarasavage 1H well. The jury found that the negligence of both GE and Carrizo was a proximate cause of the blowout.

---

[4] GE also made other arguments in this motion for summary judgment. GE filed another motion for summary judgment three weeks after it filed the first summary-judgment motion. It was largely identical to the first motion. GE filed an amended summary judgment another month later, and the standing arguments were the same.

After trial, Carrizo asked the trial court to disregard the jury's answers to questions 2b and 3. Question 2b asked whether the negligence, if any, of Carrizo proximately caused the blowout on the Yarasavage 1H well. As to Carrizo, "negligence" was defined as

> [the] failure to use ordinary care, that is, failing to do that which ***an oil and gas operator*** of ordinary prudence would have done under the same or similar circumstances or doing that which ***an oil and gas operator*** of ordinary prudence would not have done under the same or similar circumstances.

(Emphasis added.) The jury answered question 2b, "YES." Question 3 asked the jury to find the percentage of responsibility attributable to GE and Carrizo. The jury found that GE was 35% responsible and Carrizo was 65% responsible.

In its motion, Carrizo argued that GE presented no expert testimony or competent evidence on elements of duty, breach, and causation that are necessary to establish that Carrizo was negligent. Carrizo noted that GE did not object to the part of the charge that defined negligence as it applied to Carrizo as the failure to act as an ordinary and prudent oil and gas operator, as contrasted with the definition of negligence as it applied to GE as the failure to act as an ordinary and prudent person. Carrizo further argued that because GE failed to offer any expert testimony that Carrizo was negligent, the jury's answer to question 3, regarding the apportionment of fault, was moot. In response, GE argued that no expert testimony was needed because the failure to maintain the frac valve assembly through twenty

7

fracking stages was within the normal experience and common knowledge of the jurors. In August 2016, the trial court denied Carrizo's motion.

In January 2017, Judge Hall succeeded Judge Mayfield, and the parties continued to work toward a bench trial on the indemnity issues. Because there was no master service agreement ("MSA") between GE and Carrizo, GE maintained that it was entitled to indemnity based on language that appeared in four types of documents: (1) quotes for materials and services, (2) invoices, (3) order verification reports ("OVR"), and (4) field service orders ("FSO"). The quotes, invoices, and OVRs were accompanied by the same version of GE's standard terms and conditions, which provided that the buyer would indemnify GE against all claims arising out of the performance or non-performance of the contract without regard to whether the claims or damages resulted from GE's negligence. Each FSO, including the FSO for installation of the frac valve assembly for the Yarasavage 1H well, noted on its face that it was subject to terms and conditions that were attached. The terms and conditions attached to the FSOs were different from the terms and conditions that accompanied the three other types of documents. Like the other terms and conditions, the terms and conditions attached to the FSOs included a broad indemnification provision. However, the terms and conditions attached to the FSOs specifically stated that the indemnity provision extended to all claims "*whether asserted directly by Customer or by a third party*."

8

The bench trial was held in October 2018. Coleby Weinstock, Carrizo's operations engineer, and Douglas Gosda, an attorney for GE, testified live. The parties also proffered eleven deposition excerpts from nine witnesses who had knowledge of facts relevant to GE's indemnity claims. Two years later, the trial court signed findings of fact and conclusions of law. In relevant part, the trial court made the following findings of fact:

- GE "provided equipment and services to Carrizo and presented 'field services orders,' 'verification reports,' 'invoices,' and quotes" such as the January 2012 quote.

- "The field services orders and verification reports were stamped and required a signature for the sole purpose of confirming receipt of equipment and services."

- "Carrizo's [wellsite supervisors] signed the stamped field services orders and verification reports solely to confirm receipt of GE's equipment and services."[5]

- "Coleby Weinstock, a district engineer for Carrizo, approved payment for equipment and services. Carrizo electronically received invoices from GE. Weinstock electronically received a scanned copy of the front pages of an invoice that did not include any terms and conditions. Weinstock reviewed the uploaded invoice and approved or rejected payment of the uploaded invoice."

---

[5] Different terms are used throughout the record and the briefing to refer to the role of wellsite supervisor. These terms include company man, wellsite supervisor, independent contractor, wellsite consultant, completions consultant, field supervisor, and contract supervisor. Tom Weller and Larry Gerard served as wellsite supervisors for the Yarasavage 1H well, working opposite 12-hour shifts. Neither Weller nor Gerard was a direct employee of Carrizo or Carrizo Marcellus; both were independent contractors, who contracted with Carrizo to work on drilling and completion of wells in Marcellus Shale play. We refer to them as wellsite supervisors.

9

- "Carrizo did not authorize its [wellsite supervisors] or Coleby Weinstock to negotiate contract terms with its vendors or to bind Carrizo to an agreement requiring Carrizo to indemnify GE for GE's own negligence. Carrizo did not authorize its [wellsite supervisors] or Coleby Weinstock to bind Carrizo to indemnify contractors or to negotiate or agree to the terms of any indemnity contracts. Neither negotiating nor agreeing to such indemnity provisions was necessary for the [wellsite supervisors] and/or Weinstock to perform their work for Carrizo or to interact with GE."

- "Carrizo did not knowingly permit its [wellsite supervisors] or Coleby Weinstock to hold themselves out as having authority to execute indemnity agreements on behalf of Carrizo. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Carrizo never told the [wellsite supervisors] or Coleby Weinstock they possessed any authority to approve and bind Carrizo to indemnity agreements. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Carrizo never told GE the [wellsite supervisors] or Coleby Weinstock had authority to approve and bind Carrizo to indemnity agreements. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Coleby Weinstock reviewed and approved several invoices electronically submitted by GE for equipment and services. The electronically submitted invoices did not include the back side of the invoice, which included an indemnity provision."

- "By its express terms," the January 2012 quote "expired on February 23, 2012. At the time GE provided equipment and services to Carrizo," the January 2012 quote "had expired. Further, no evidence exists in this record that the [January 2012 quote] provided by GE to Carrizo included the terms and conditions GE seeks to enforce."

- "The field services order is two-sided. The indemnity provision is on the back side of the field services order. The document is thin, and the entire indemnity provision is in very small font, regular typeface, and not capitalized."

- "Coleby Weinstock reviewed and approved several invoices electronically submitted by GE for equipment and services. The electronically submitted invoices did not include the back side of the invoice, which included an indemnity provision."

- "In exchange for the money paid by Carrizo, it received equipment and GE's installation services."

- "Carrizo received no benefit in exchange for a promise to indemnify GE for GE's negligence, and GE incurred no loss or detriment."

- "Not all attorney's fees and expenses GE seeks were reasonable and necessary to defend against Carrizo's lawsuit."

- "Certain experts retained by GE were excluded or their testimony was substantially limited, and expenses associated for those particular experts are neither reasonable nor necessary."

- "GE was found partially liable for the blowout and resulting damages. The jury found GE to be 35% liable and at fault."

The trial court also made the following conclusions of law:

- "A reasonably prudent person would not rely on any conduct by or apparent authority of the [wellsite supervisors] or Coleby Weinstock to bind Carrizo to indemnity agreements. . . . The [wellsite supervisors] and Coleby Weinstock did not have actual or apparent authority to bind Carrizo to the indemnity agreements. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Neither Carrizo's prior payments of GE's invoices nor any other course of conduct created an implied acceptance or agreement by Carrizo of the terms and conditions on the back side of GE's

11

electronically submitted field tickets and invoices, including the indemnity provision."

- "Weinstock's approval of GE's electronically submitted invoices does not constitute ratification of, acceptance of, or agreement to the indemnity provisions in GE's field service orders and verification reports."

- "The indemnity provisions on the back side of the field services order is not conspicuous, does not meet the express negligence test, and is unenforceable."

- "The indemnity provisions on the back side of the GE invoice is not conspicuous, does not meet the express negligence test, and is unenforceable."

- "The indemnity provisions in the field services orders, verification reports, invoices, and [the January 2012 quote] (even if they were included as part of the invoices or Quotation, which the Court finds they were not) are unenforceable against Carrizo as unconscionable and grossly one-sided in favor of GE. . . . As written, GE would be entitled to pursue indemnity from Carrizo for all its costs arising from a claim even if Carrizo had completely prevailed against GE in the first trial."

- "[T]he indemnity agreement in the field services orders, verification reports, invoices, and [the January 2012 quote] (even if they were included as part of the invoices or Quotation, which the Court finds they were not) are void for lack of valid consideration."

About three months after the trial court issued its findings of fact and conclusions of law, Carrizo again filed a motion for judgment notwithstanding the verdict asking the trial court to disregard the jury's answers to question 2b and question 3. Carrizo raised the same arguments that it made when it first urged this motion after the jury trial. GE again argued that the motion should be denied,

12

noting that the trial court had previously considered and denied the same arguments. Both Carrizo and GE submitted transcripts of relevant trial testimony for the court's consideration.

The trial court granted Carrizo's motion, and it entered final judgment in favor of Carrizo in the amount of $2,531,785.68 (total) plus pre- and post-judgment interest. The court also rendered judgment that GE was not entitled to indemnity, and it incorporated its findings of fact and conclusions of law into the final judgment by reference. GE appealed.

## Analysis

GE raises three issues on appeal. First, GE argues that Carrizo lacked standing to sue because Carrizo Marcellus was the undisputed owner and operator of the Yarasavage 1H well. Second, GE argues that the trial court erred by granting Carrizo's motion to disregard the jury's verdict, especially when the judge who granted the motion was not the judge who presided over the jury trial. Third, GE argues that the trial court erred by refusing to enforce the indemnity provisions in the contracts that formed the parties' agreement.

I.     **Carrizo has standing to sue GE because it is personally aggrieved and the 100% owner of Carrizo Marcellus.**

In its first issue, GE argues that Carrizo lacked standing to sue because Carrizo Marcellus was the undisputed owner and operator of the Yarasavage 1H well. GE maintains that an assignment of claims from Carrizo Marcellus to Carrizo

13

after the suit was filed was ineffective because limitations had already run. GE also contends that the nature of this case as a subrogation claim does not affect the analysis because an insurer can only assert claims that the insured could itself assert.

Carrizo argues that both Carrizo and Carrizo Marcellus had standing to sue, and both were insured by Gemini Insurance Company. Carrizo maintains that this case is a subrogation suit, and the real party in interest is Gemini. Carrizo further reasons that because Gemini was fully subrogated to the rights of both Carrizo and Carrizo Marcellus, it had standing to sue and could do so in its own name, or in the name of its insureds.

## A. Legal standards

### 1. Standing and subject-matter jurisdiction

"Subject matter jurisdiction is essential to a court's authority to decide a case." *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993)). A party's standing to sue is implicit in the concept of subject-matter jurisdiction. *Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 279 (Tex. 2016) (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 445–46). Standing is a question of law, which we review de novo. *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018); *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012).

14

"In Texas, the standing doctrine requires a concrete injury to the plaintiff and a real controversy between the parties that will be resolved by the court." *Heckman*, 369 S.W.3d at 154. "The standing requirement derives from the Texas Constitution's provision for separation of powers among the branches of government, which denies the judiciary authority to decide issues in the abstract, and from the open courts provision, which provides court access only to a 'person for an injury done him.'" *Meyers*, 548 S.W.3d at 484 (quoting TEX. CONST. art. I, § 13); *see Tex. Ass'n of Bus.*, 852 S.W.2d at 443–44.

Texas's standing test parallels the federal test for Article III standing, which requires a plaintiff to allege "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Heckman*, 369 S.W.3d at 154; *see also Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 778 (Tex. 2020) (looking to federal jurisprudence to resolve issue of standing under Texas law). The Texas Supreme Court has adopted the three-element test for standing articulated by the United States Supreme Court:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Heckman*, 369 S.W.3d at 154–55 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)) (citations omitted); *see In re Abbott*, 601 S.W.3d 802, 807 (Tex. 2020) (noting that Supreme Court of Texas has adopted this standard).

The Supreme Court of Texas has held that "a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization." *Pike*, 610 S.W.3d at 778. In *Pike*, the Supreme Court noted that "statutory provisions . . . define and limit a stakeholder's ability to recover certain measures of damages, which protect the organization's status as a separate and independent entity." *Id.* at 778. However, the Court also opined that "[t]hose provisions, however, go to the merits of the claim," but they do not deprive a court of subject-matter jurisdiction. *Id.*

### 2. Capacity

"A plaintiff must have both standing and capacity to bring a lawsuit." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'" *Lovato*, 171 S.W.3d at 848 (citing 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1559, at 441 (2d ed. 1990)). "Separate from the issue of a party's standing, a party's capacity implicates its

legal authority to file a lawsuit and pursue a particular cause of action." *Mariner Health Care of Nashville, Inc. v. Robins*, 321 S.W.3d 193, 200 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *Lovato*, 171 S.W.3d at 848). "A plaintiff has *standing* when it is personally aggrieved, regardless of whether it is acting with legal authority; a party has *capacity* when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy." *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996) . Whether a claim brought by a stakeholder in a business organization actually belongs to the organization is a matter of capacity. *Pike*, 610 S.W.3d at 779.

The burden is on the defendant to challenge a plaintiff's capacity to sue. *Lovato*, 171 S.W.3d at 853 n.7. An alleged defect in capacity must be raised by a verified denial in the trial court. *Id.* at 849. Once capacity is controverted by a verified denial, the plaintiff must prove at trial that it is entitled to recover in the capacity in which it has sued. *Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 432 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). If the court submits a question to the jury assuming the capacity originally pleaded, the defendant must object to that question or risk waiver of the issue of capacity. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *Republic Petroleum*, 474 S.W.3d at 432.

### 3. Subrogation

Subrogation means "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." *Subrogation*, BLACK'S LAW DICTIONARY (11th ed. 2019). The doctrine of subrogation commonly arises in the context of insurance. *Fed. Home Loan Mortg. Corp. v. Zepeda*, 601 S.W.3d 763, 765 n.3 (Tex. 2020). Whether the right to subrogation arises from contract (conventional subrogation) or by virtue of the involuntary payment of a debt for which another was primarily liable (equitable subrogation), when an insurer exercises its subrogation rights, it "stands in the shoes of the insured, obtaining only those rights held by the insured against a third party, subject to any defenses held by the third party against the insured." *Mid-Continent Ins. Co. v. Liberty Mut. Ins. Co.*, 236 S.W.3d 765, 774–75 (Tex. 2007) (citing *Interstate Fire Ins. Co. v. First Tape, Inc.*, 817 S.W.2d 142, 145 (Tex. App.—Houston [1st Dist.] 1991, writ denied)); *see Frymire Eng'g Co., Inc. ex rel. Liberty Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008) ("The doctrine of equitable subrogation allows a party who would otherwise lack standing to step into the shoes of and pursue the claims belonging to a party with standing."); *Uddin v. Cunningham*, No. 01-18-00002-CV, 2019 WL 4065273, at *5 (Tex. App.—Houston [1st Dist.] Aug. 29, 2019, pet. dism'd) (mem. op.) (same). The insurance company can bring suit in its

18

own name or in the name of its insured. *See Finger v. S. Refrigeration Servs., Inc.*, 881 S.W.2d 890, 894 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("Because Finger [the insured] had the right to sue for damages to his property, Travelers, as the insurance company that paid for the repairs, had the right to sue in his name for its subrogation interest."); *see also Sullivan v. Smith*, 570 S.W.2d 197, 197 (Tex. Civ. App.—Houston [1st Dist.] 1978, no writ) (noting that insurance subrogation claim was brought in name of insured).

## B.    Carrizo has standing to sue

GE's arguments broadly fall into two categories. First, GE argues that Carrizo did not have standing because it did not suffer an injury. Thus, GE contends, the doctrine of subrogation does not change the outcome because the insurer was limited to asserting the claims of Carrizo, and Carrizo had none. Second, GE argues that an assignment of claims from Carrizo Marcellus to Carrizo was ineffective to confer standing because the assignment occurred after limitations expired.

### 1.    Carrizo suffered an injury

In the trial court, Carrizo relied on an affidavit from Larry Michael Kennington, the associate general counsel of Carrizo and the general counsel of Carrizo Marcellus, to prove it sustained damages from the blowout. Kennington explained that Carrizo Marcellus, a wholly-owned subsidiary of Carrizo, operated

19

the Yarasavage 1H well on behalf of itself and its joint venture partner, who together held a 71.63% interest in the well. Carrizo Marcellus obtained insurance on behalf of itself, its joint venture partner, and "certain other non-operating working interest owners, totaling 81.59% of the insurable interests in the Well." The remaining non-operating working interest owners insured their own interests separately. Kennington also averred:

> 4.    Eighty-one-point-five-nine percent (81.59%) of all of the well control costs and remediation costs, including testing, monitoring, evaluation, and cleanup operations, which are being sought as damages in this litigation damages [sic] were incurred and paid either by [Carrizo Marcellus] or [Carrizo]. To the extent that [Carrizo Marcellus] paid any of the damages, [it] was reimbursed by or the costs were passed on to [Carrizo]; therefore, ultimately, [Carrizo] has paid and continues to pay all the damages.

> 5.    [Carrizo Marcellus] has assigned to [Carrizo] all rights, privileges, entitlements, or causes of action, whether in contract, tort, or otherwise and whether existing now or in the future, which [Carrizo Marcellus] has or may have against the defendants in this case, or other responsible parties, pertaining to the damges. . . . .

> 6.    [Carrizo] submitted an insurance claim for the damages, to its insurer, Gemini Insurance Company. Gemini has reviewed, adjusted, paid and indemnified, and is continuing to review, adjust, and pay and indemnify [Carrizo] for the damages. Gemini is therefore subrogated to all claims of both [Carrizo Marcellus] and [Carrizo] for the damages and is the real party in interest in this litigation.

> The affidavit was dated November 30, 2015, and the assignment, which was not otherwise dated, stated: "Effective April 30, 2014."

20

GE's argument centers on the first element of standing: that the plaintiff must have suffered an "injury in fact." *See Lujan*, 504 U.S. at 560. GE asserts that it was Carrizo Marcellus—not Carrizo—that suffered damages from the well blowout. GE maintains that a corporation cannot sue to recover costs incurred by its subsidiary. Kennington's affidavit is evidence that Carrizo itself incurred costs and suffered damages as a result of the well blowout. In addition, the evidence at trial showed that there was some overlap between Carrizo and Carrizo Marcellus's operations. For example, Weinstock worked directly for Carrizo, and the contracted wellsite supervisors—Tom Weller and Larry Gerard—had contracts with Carrizo, not Carrizo Marcellus. In addition, GE sent its invoices related to the Yarasavage 1H well to Carrizo, not Carrizo Marcellus, and Carrizo was listed as the customer on field service orders. The evidence supports a conclusion that Carrizo suffered an injury in fact sufficient to confer standing in the constitutional sense. *See id.*; *Meyers*, 548 S.W.3d at 485.

### 2. Carrizo suffered an injury as the owner of Carrizo Marcellus

In addition, the undisputed evidence was that Carrizo Marcellus was a wholly-owned subsidiary of Carrizo. As a stakeholder, Carrizo has constitutional standing to sue for an alleged loss in the value of its interest in Carrizo Marcellus. *See Pike*, 610 S.W.3d at 778. Because Carrizo Marcellus was wholly owned by Carrizo, to the extent that the damages were suffered only by Carrizo Marcellus,

21

Carrizo nevertheless had an interest in the economic impact of the multimillion-dollar damages suffered by its subsidiary on the value of Carrizo Marcellus. This interest was sufficient to confer jurisdiction in the constitutional sense of an injury in fact.[6] *See Lujan*, 504 U.S. at 560–61; *Pike*, 610 S.W.3d at 778.

* * *

Finally, GE argues that the assignment of claims from Carrizo Marcellus to Carrizo was not effective because it occurred after limitations had expired. Limitations is an affirmative defense, not a jurisdictional requirement. *See Uddin*, 2019 WL 4065273, at *6. "[A] plaintiff does not lack standing in its proper, jurisdictional sense 'simply because he cannot prevail on the merits of his claim; he lacks standing [when] his claim of injury is too slight for a court to afford redress.'" *Pike*, 610 S.W.3d at 774 (quoting *Meyers*, 548 S.W.3d at 484–85).

We have already concluded that Carrizo had standing in the constitutional sense because it suffered an injury in fact and had a 100% ownership interest in Carrizo Marcellus. We overrule GE's first issue.

---

[6] In this case, GE filed a verified pleading challenging Carrizo's capacity. At trial, the jury charge did not include any questions or instructions relevant to capacity. The charge asked—and the jury found—that Carrizo suffered damages in an amount exceeding $2.5 million. GE did not object to the damages question (question no. 5), nor did it request an instruction narrowing the damages question to the lost value of Carrizo's interest in Carrizo Marcellus resulting from the blowout. Thus, GE waived any issue of Carrizo's capacity. *See Republic Petroleum LLC v. Dynamic Offshore Res. NS LLC*, 474 S.W.3d 424, 432 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). On appeal, GE has not challenged Carrizo's capacity, the jury charge (including the damages question), or the jury's answer to the damages question.

**II.    The trial court did not err by granting Carrizo's motion to disregard the jury's findings.**

In its second issue, GE argues that the trial court erred by vacating that part of the jury's verdict that found Carrizo's negligence contributed to the blowout and that Carrizo was 65% responsible for damages. GE contends that this unfairly made it responsible for 100% of the damages as opposed to 35% of the damages. Carrizo asserts that expert testimony was required to prove all the elements of GE's contributory negligence allegation because the jury was asked whether Carrizo failed to act as "an oil and gas operator of ordinary prudence," and GE presented no such expert testimony. GE responds that expert testimony was not required, and even if it were required, testimony from Carrizo's expert, Weinstock, and GE's salesman Robert Ripple was sufficient to prove the standard of care and the breach of the standard of care.

**A.    Preliminary considerations**

**1.    GE cannot challenge the jury charge's differing definitions of negligence on appeal.**

In addition, GE argues that if expert testimony were required to prove Carrizo's negligence, it was also required to prove GE's negligence. We disagree with this contention. In Question No. 2, the jury was asked whether the negligence, if any, of GE and Carrizo proximately caused the blowout. But negligence was defined differently for GE and Carrizo. As to GE, the jury charge stated:

23

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

As to Carrizo, the jury charge stated:

"Negligence" means failure to use ordinary care, that is failing to do that which an oil and gas operator of ordinary prudence would have done under the same or similar circumstances or doing that which an oil and gas operator of ordinary prudence would not have done under the same or similar circumstances.

GE did not object to the part of the charge that defined negligence differently as applied to Carrizo compared to how it defined negligence as it applied to GE. GE also did not challenge the court's charge on appeal. Any complaint about the charge is waived. *See Osterberg*, 12 S.W.3d at 55. Under the charge as given, the jury was only required to assess GE's negligence under the standard of an ordinarily prudent person, not a standard relating to specialized skills or activities.

## 2. GE did not challenge the jury's finding of damages on appeal.

In addition, although GE argues that the trial court's action in disregarding some of the jury's answers transformed the verdict finding it 35% responsible into a judgment making it 100% responsible, GE has not complained about the jury's assessment of damages on appeal.

24

Questions 2 and 5 asked about damages. Question 2 was subdivided into parts "a" and "b":

Did the negligence, if any, of those named below proximately cause the blowout on the Yarasavage No. 1H well?

Answer "Yes" or "No" for each of the following:

    a.    GE:        <u>YES</u>

    b.    Carrizo:   <u>YES</u>

The jury answered "yes" to both GE and Carrizo. The jury further found that GE was 35% responsible for the blowout and that Carrizo was 65% responsible for it. Question 5 asked:

QUESTION 5

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Carrizo for its damages, if any, that resulted from the conduct you found in response to Questions 1, ***2.a***, or 4.

Consider the following elements of damages, if any, and none other.

Do not add any amount for interest on damages, if any.

Do not reduce the amounts, if any, in your answers because of the negligence, if any, of the Plaintiff. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Answer separately in dollars and cents for damages, if any.

1.  Costs to bring the well under control sustained in the past.

Answer:    <u>$ 300,068.81</u>

2. Costs to remediate, test and monitor the land sustained in the past.

Answer:     $ 2,003,264.87

3. Costs to remediate, test and monitor the land which will, reasonable probability, will be sustained in the future. [sic]

Answer:     $ 228,452.00

(Emphasis added.)

GE did not object to the submission of question 5, which asked for the amount of damages that would compensate Carrizo for the damages arising from the conduct in question 2a. Question 2a asked only about the negligence of GE. Thus, as written, the charge asked the jury to determine the amount of damages caused by GE's negligence, not the total amount of damages sustained by Carrizo. Because GE did not object to question 5, it cannot (and did not) complain about it on appeal. *See id.*

## B.     Standards of review

"We review a trial court's grant of a judgment notwithstanding the verdict under a no-evidence standard, examining whether any evidence supports the jury's findings." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). We consider the evidence in the light most favorable to the jury's verdict, indulging every reasonable inference in favor of the verdict and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). No evidence exists when there is:

26

(a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)).

Carrizo and GE each pleaded that the other's negligence caused the blowout and ensuing damages. Thus, each was required to establish the elements of negligence as to the other party. *See Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017). "The elements of a common-law negligence claim are (1) a legal duty; (2) a breach of that duty; and (3) damages proximately resulting from the breach." *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144 (Tex. 2022). "The threshold inquiry in a negligence case is duty." *Id.* (quoting *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990)). The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question. *Id.*; *Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404–05 (Tex. 2009).

Whether expert testimony is necessary to establish negligence is a question of law, which we review de novo. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89 (Tex. 2004); *Simmons v. Briggs Equip. Tr.*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.). "Expert testimony is necessary

when the alleged negligence is of such a nature as not to be within the experience of the layman." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982). To determine whether expert testimony is required, we consider "whether the conduct at issue involves the use of specialized equipment and techniques unfamiliar to the ordinary person." *FFE Transp. Servs.*, 154 S.W.3d at 91. "In such a case, the expert testimony must establish both the standard of care and the violation of that standard." *Simmons*, 221 S.W.3d at 114.

In *FFE Transportation*, a long-haul trucker was injured in an accident while he was driving a refrigerated trailer. *Id.* at 86. The trucker had inspected the pre-loaded refrigerated trailer and the tractor-trailer connection before he began driving. *Id.* While exiting a highway, "the trailer's upper coupler assembly broke loose from the trailer, causing the trailer to separate from the tractor and overturn." *Id.* The trucker sued FFE Transportation, alleging that the trailer he was driving was defective "because the bolts and plates anchoring the upper coupler assembly to the trailer were missing or weak or both due to rust and inadequate torque." *Id.* at 87. The trial court granted a directed verdict because the trucker did not present any expert testimony to establish the applicable standard of care. *Id.* The court of appeals, however, reversed, holding that expert testimony was not required to show the standard of care because "the inspection and detection of loose and rusty bolts connecting parts of a trailer" was not beyond the experience of laymen. *Id.*

28

The Texas Supreme Court disagreed, holding that expert testimony was necessary to establish the standard of care and its breach. *Id.* at 91. The Supreme Court held:

> The upper coupler assembly, kingpin, and base rail of a refrigerated trailer are specialized equipment, and the proper inspection and maintenance of those parts involve techniques unfamiliar to the ordinary person.
>
> Few people not involved in the trucking industry are familiar with refrigerated trailers, the mechanisms for connecting them to tractors, and the frequency and type of inspection and maintenance they require. While the ordinary person may be able to detect whether a visible bolt is loose or rusty, determining when that looseness or rust is sufficient to create a danger requires specialized knowledge. Therefore, the layman does not know what the standard of care is for the inspection and maintenance of the upper coupler assembly, kingpin, and base rail of a refrigerated trailer.

*Id.*

Other cases have engaged in a similar analysis to determine whether expert testimony is required to establish the standard of care and its breach in negligence cases. *See, e.g.*, *Knox v. Eagle Water Mgmt., Inc.*, No. 01-17-00627-CV, 2018 WL 891239, at *3 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, no pet.) (mem. op.); *Fairways Offshore Expl., Inc. v. Patterson Servs., Inc.*, No. 01-11-00079-CV, 2013 WL 371601, at *6 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, pet. denied) (mem. op.), *op. partially withdr. by agrmt.*, 2013 WL 3148263 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, no pet.) ; *Simmons*, 221 S.W.3d at 109.

### C. Expert testimony was required to establish the standard of care and breach in this case.

In its brief, GE initially evaluates all the evidence under the JNOV standard of review. However, Carrizo's contention in the trial court and on appeal is that expert testimony was necessary to establish both the standard of care and breach of that standard in this case. Before we consider whether the evidence satisfies the JNOV standard of review, we must first determine whether expert testimony is required to establish the duty and the breach of that duty, because that determination will inform our legal sufficiency review of the evidence. *See Jelinek v. Casas*, 328 S.W.3d 526, 533 (Tex. 2010) ("Lay testimony may be used as evidence of causation in certain circumstances, but '[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient.'" (quoting *City of Keller*, 168 S.W.3d at 812)).

On appeal, GE argues that Carrizo was negligent in monitoring the frac valve assembly and that failure to detect a leaking flange below the master valve caused the damage from the blowout. GE argues that expert testimony was not needed because it was within the experience of the layman that failing to visually monitor and check the torque on nuts and bolts on the frac valve assembly caused Carrizo's damages.

Carrizo argues that the conduct of oil and gas operators during fracking processes is "well outside the common knowledge of laypersons." Carrizo relies on

precedent from the court to reason by analogy that expert testimony was required in this case. *See Knox*, 2018 WL 891239, at \*4; *Fairways Offshore*, 2013 WL 371601, at \*6; *Simmons*, 221 S.W.3d at 109.

In *Knox*, homeowners sued a pumping facility operator after the wastewater pumps in their neighborhood failed during a heavy rainfall and wastewater flooded their homes. 2018 WL 891239, at \*1. The trial court granted summary judgment in favor of the pumping facility operator, and the homeowners appealed. *Id.* at \*2. On appeal, we assumed that "expert testimony was not required to show that [the pumping facility operator] owed a legal duty to the homeowners." *Id.* at \*3. But we held that expert testimony was required to show that a breach of that duty caused the flooding. *Id.* We explained:

> The answer to whether a breach occurred thus requires an understanding of the specific cause of the pump stoppage and [the pumping facility operator's] role, if any, in contributing to that cause. The pumps at the lift station are specialized equipment. To evaluate the evidence about the proper operation and maintenance of the pumps, a jury would require information concerning the equipment and processes involved in operating a sanitary wastewater collection, transportation, and treatment system, as well as the impact of the weather event that preceded the pump stoppage. Testimony from a witness with specialized knowledge of those operations is necessary to identify whether the stoppage resulted in part from [the pumping facility operator's] failure to act as a reasonably prudent operator.

*Id.* at \*4. Because there was no expert testimony attributing the pump stoppage and flooding to the pumping facility operator's failure to act as a reasonably prudent

31

operator, we concluded that the trial court properly granted summary judgment. *Id.* at *5.

In *Fairways Offshore*, Fairways was the operator and leaseholder of a natural gas well in Wyoming. 2013 WL 371601, at *1. Fairways hired a contractor to complete the well, which contained a high concentration of hydrogen sulfide. *Id.* During the completion process, the contractor lowered its equipment into the well under a nitrogen blanket. *Id.* Overnight, to relieve pressure in the well, Fairways decided to "flow the well," which introduced gas that displaced the protective nitrogen blanket. *Id.* The next day, the contractor's equipment failed. *Id.* at *2. The gas that Fairways released into the well contained hydrogen sulfide, which caused a sulfide-stress fracture in the contractor's equipment. *Id.* The contractor's equipment failure caused property damage but no personal injuries. *Id.* Fairways sued the contractor for negligence, and the contractor countersued Fairways for negligence. *Id.* We held that expert testimony was required to prove the standard of care applicable to Fairways and whether Fairways breached the standard of care. *Id.* at *8. We held:

> [T]he proper operation of a sour gas well is not a matter within the experience of laypersons. Specifically, whether or not the use of a nitrogen blanket in a well, such as the one in this case, was necessary to protect the well piping and equipment, would be unfamiliar to the ordinary person.

*Id.* at *6.

In *Simmons*, an employee was injured when he was forced to jump from a rail-car mover when a fire started in its engine compartment. 221 S.W.3d at 111. His employer sued the company that had contracted to provide maintenance services for the rail-car mover. *Id.* at 112. The trial court granted a no-evidence summary judgment, and the employer appealed. *Id.* We held that expert testimony was required to prove that the contractor was negligent:

> Here, the record reveals that the maintenance and service of a [rail-car mover] involves specialized equipment and techniques unfamiliar to a lay person. Few people not involved in the rail-car industry are familiar with rail-car movers, the functioning of their engines and other internal parts, or the frequency and type of inspection and maintenance they require. . . . A maintenance company's practices and procedures and industry standards with respect to the inspection and maintenance of a . . . rail-car mover engine are not matters within a lay person's general knowledge. Accordingly, we hold that Simmons needed expert testimony regarding the appropriate standard of care and whether Briggs's conduct met that standard.

*Id.* at 114–15 (citations omitted).

Other courts of appeals have used the same type of reasoning to reach similar conclusions. *See, e.g., Greater San Antonio Transp. Co. v. Polito*, No. 04-10-00330-CV, 2011 WL 2893080, at *4 (Tex. App.—San Antonio July 20, 2011, pet. denied) (mem. op.) (requiring expert testimony because taxicab dispatch equipment and manner in which it functions is unfamiliar to lay people); *Schwartz v. City of San Antonio*, No. 04–05–00132–CV, 2006 WL 285989, at *4 (Tex. App.—San Antonio Feb. 8, 2006, pet. denied) (mem. op.) (requiring expert

33

testimony because "[w]hat a power company's practices and procedures should be, or what industry standards are, when a circuit breaker within an electrical distribution is tripped are not within a person's general knowledge").

GE contends that not all cases involving technical matters require expert testimony. *See AKIB Constr. Inc. v. Shipwash*, 582 S.W.3d 791, 804 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In *AKIB Construction*, Shipwash, the owner of a business that handles hazardous materials, contracted with AKIB Construction to facilitate the purchase, dismantling, removal, storage, and reassembly of a steel building. *Id.* at 795. Shipwash later sued AKIB Construction for breach of contract for failing to properly deconstruct the building and deliver it to his storage facility. *Id.* at 796. At trial, a site supervisor for one of Shipwash's companies testified that pieces of the steel building were significantly damaged, that he witnessed workers improperly dismantling the building, and that the metal removed from the building could not be reused and was scrap. *Id.* at 798–99. The trial court found that AKIB Construction breached the contract and rendered judgment in favor of Shipwash. *Id.* at 802.

On appeal, AKIB Construction argued that Shipwash was required to present expert testimony to prove that its actions caused the metal removed from the building to be unusable. *Id.* We disagreed, relying on the following statement from a 1970 opinion from the Texas Supreme Court:

34

The trier of fact is usually allowed to decide the issue of causation in cases of this nature: (1) when general experience and common sense will enable a layman fairly to determine the causal relationship between the event and the condition; (2) when scientific principles, usually proved by expert testimony, establish a traceable chain of causation from the condition back to the event; and (3) when probable causal relationship is shown by expert testimony.

*Id.* at 803 (quoting *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970)).

In *AKIB Construction*, in addition to testimony adduced at trial, photographs showing the building before it was dismantled and after parts of the building had been removed were admitted into evidence. *Id.* at 804–05. The "after" photos showed "pieces of sheet metal lying crumpled and bent in piles around the jobsite," and "retractable garage-type doors, lying bent and broken on the ground." *Id.* at 804. We concluded that "a factfinder applying a 'commonsense understanding' could consider the before and after pictures of the steel building and, with reasonable probability, reach a conclusion that the building was damaged during the dismantling process." *Id.* at 805.

Here, GE argues that this case is more like *AKIB Construction*. GE asserts that "[t]he damage in this case was caused by a leak that was not detected and became a blowout." GE further asserts that the leaks were caused by loose bolts, because the jury rejected the alternate theory that the leaks were caused by using a "too-hard" gasket. Therefore, GE contends that "it was within the jury's common

35

sense and experience to find that[,] had Carrizo been monitoring and checking for leaks or loosened bolts, this blowout would not have occurred."

We disagree with GE's conclusion that no expert testimony was required as well as its characterization of the evidence. In *AKIB Construction*, the question for the factfinder was whether the components of the steel building were in a usable condition after the building was dismantled. The photographs and testimony there established that the components of the building were damaged and broken. Here, the question is whether Carrizo's negligence caused damages from the blowout.

A frac valve assembly, including the master valve, the spool, the high-pressure rated flange, the nuts and bolts needed to connect the component parts, and the torque wrenches used for installation are specialized equipment. The proper inspection and maintenance of those parts, particularly during a fracking operation, involve techniques unfamiliar to the ordinary person. Few people not involved in the petrochemical industry–particularly oil and gas well drilling and completion operations–are familiar with this specialized equipment and its proper use and maintenance. While an ordinary person may be able to detect whether fluid is leaking from equipment, an ordinary person would not be able to detect when a frac valve assembly is properly constructed, whether the nuts and bolts are adequately torqued, and whether or how the construction and torquing of a frac valve assembly creates a danger of a well blowout. Therefore, the layman does not

know what the standard of care is for the inspection, operation, and maintenance of a frac valve assembly during an active fracking operation of a gas well. Accordingly, we conclude that GE was required to present expert testimony about the standard of care and how Carrizo's breach of the standard of care caused the blowout. *See FFE Transp. Servs.*, 154 S.W.3d at 91; *Knox*, 2018 WL 891239, at *3–4; *Fairways Offshore*, 2013 WL 371601, at *6; *Simmons*, 221 S.W.3d at 114.

**D.    GE did not present expert testimony showing the standard of care applicable to Carrizo and that Carrizo's breach of the standard of care caused the blowout and ensuing damages.**

Carrizo correctly notes that GE did not adduce testimony at trial from a designated expert witness regarding the standard of care of an oil and gas operator regarding inspection, maintenance, and operation of a frac valve assembly during fracking operations. However, GE also correctly notes that many of the witnesses who testified had educational and experiential credentials in the specialized areas of knowledge at issue in this case. Carrizo presented the following witnesses at trial:

- **Coleby Weinstock.** Weinstock has a B.S. in Petroleum Engineering from Texas A&M University. He had eleven years' experience in oil and gas production and well completion jobs prior to joining Carrizo as a district engineer in 2011. He testified that he was not aware of any maintenance needed for the flange connection beneath the master valve on the frac valve assembly. He also testified that, if properly assembled, the flange connections cannot come apart during fracking operations. He testified that Baker Hughes, the fracking contractor, checked for leaks in the "hot area" near the well during fracking. This would include the pressurized frac valve assembly. Weinstock said that Carrizo employs a roustabout whose job is to

37

check for leaks on all equipment. He said that the GE report from the day of the blowout indicated that the frac valve assembly was not leaking at all before the blowout. Weinstock said that torque checking, as opposed to visually inspecting for leaks, was not an industry standard practice before the blowout and was not an industry standard practice after the blowout. He also said that he had successfully fracked at least 40 wells without torque checking between fracking stages. Despite the lack of an industry standard for torque checking, since the blowout, Carrizo has adopted a practice of torque checking every fourth fracking stage or fifth day.

- **Brad Fisher.** Fisher is the Chief Operating Officer and Vice President of Carrizo since 2005. He has a B.S. in Petroleum Engineering from Texas A&M University. He had 32 years' experience in the oil and gas industry by the time of trial. Fisher testified: "In my 32 years, I had never been provided a piece of paper by any wellhead or frac tree company saying that [the flange beneath the master valve] required maintenance."

- **Devon Feaster.** Feaster was the GE service technician who installed the frac valve assembly for Yarasavage 1H well. He testified that he had never heard that a company like Carrizo should be aware of a need to retorque flanges during a fracking job. He said that if the flanges are properly torqued at installation, there should be no need to retorque during the fracking job. He also testified that he was on site during the fracking of the Yarasavage 1H well, and he said that he saw more vibration than he witnessed in other jobs. However, the record suggests that he may have been referring to something he saw after the blowout because he also testified that he could not recall having been present during a fracking operation prior to January 2013.

- **Dustin Duff.** Duff was a GE service technician, who was involved in the fabrication of the lower part of the frac valve assembly for the Yarasavage 1H well. He said that before the blowout, he was never involved in retorquing nuts on frac valve assembly. he also said that before the blowout, he was not aware of any GE customer who checked torque between fracking stages.

- **Ben Holgate.** Holgate is a GE employee. He is a licensed professional engineer in Texas, and he has a degree in mechanical engineering. He was involved in GE's root cause analysis of the blowout incident. He said that GE could not conclude "that Carrizo did anything wrong," because GE did

not have sufficient information to assess external loads or extent of vibration.

- **Tom Weller.** Weller is a civil engineer, with a degree from Pennsylvania State University. He began working on fracking jobs for Halliburton after graduating in 1981. Since 1985, he had been the lead engineer for drilling and fracking jobs. He was a contracted wellsite supervisor and consultant for Carrizo on the Yarasavage 1H well. He testified that it was not standard practice to do any preventive maintenance on the frac valve assembly during fracking. He said that the only maintenance conducted was on an as-needed basis. He said that he had never checked bolts during a frac job.

- **Simon Bellemare.** He is a licensed professional engineer in eight states, including Texas. He has a PhD in materials science and engineering from Massachusetts Institute of Technology. He lectures at MIT, works as a welding inspector, and had a start-up company developing non-destructive testing techniques for in situ testing of pipelines and equipment. He belongs to numerous professional societies, has published many papers, and won several awards. He testified as an expert for Carrizo. He testified that improper installation of the ring gasket was a contributing cause of the blowout and that there was some evidence that the ring gasket (in the flange) was titled when it was removed.

- **Mark Beny.** He is an oil and gas fracturing consultant, who worked onsite at the Yarasavage 1H well. He has a B.S. in chemical engineering from Ohio State University, and he has worked as an oil and gas fracturing consultant since 2009. Prior to that, he worked for Halliburton for 23 years, for Weatherford for three years in a fracturing facility in Oklahoma, and for nearly two years as a production engineer for Occidental Petroleum. He testified that he has fracked thousands of wells in his career and never witnessed the nuts on an API 6A flange (like the flange that failed on the Yarasavage 1H well) come loose. He said he had never heard of anyone maintaining the API 6A flange connections between the tubing head and the spool and between the spool and the master valve. He said that nobody checks torque during fracking operations, and he testified that not checking the torque between fracking stages was "an industry standard." He was present onsite at the Yarasavage 1H well during fracking, and he said that the frac valve assemblies were constantly monitored by a Baker Hughes employee working in the role of "line boss." Beny testified that the frac valve assembly was not leaking before the blowout. He said it went from no

39

drip or leak to a total blowout. He said that in his 35 years of experience, "very, very rarely do bolts come loose," and that he had "never ever witnessed a blowout because of the bolts coming loose" before the Yarasavage 1H blowout. He also said that checking torque would not have avoided the blowout in this case.

- **Judd Hansen.** Hansen has a B.S. in mechanical engineering from South Dakota School of Mines and Technology and 34 years' experience in working for oil and gas operators. He consulted with Carrizo to review its actions after the incident and determine if a documented standard of care exists regarding the flange that failed on Yarasavage 1H well. He testified that he had seen hundreds of thousands of API 6A flanges (like the one that failed at the Yarasavage 1H well) in his experience. He said that they are designed for long-term use, like up to 30 years in some installations, and he said that he had never seen a properly installed flange fail in his oil and gas experience. He testified that there is no documented, published guidance from API (American Petroleum Institute), the Society of Petroleum Engineers, the American Association of Drilling Engineers, or the American Society of Mechanical Engineers stating that a properly made-up flange with a proper ring gasket needs any maintenance. He opined that Carrizo had no obligation to periodically check the API 6A flange connection. Hansen testified that with proper assembly, proper equipment, and a pressure tested flange, failure is not foreseeable: "The flange should never fail based on industry expectations." He did, however, say that visual monitoring of the frac valve assembly for leaks is the industry standard, but it is not considered maintenance.

- **Dawn Washo.** Washo is a licensed geologist who worked with Carrizo on clean up after the blowout.

GE presented the following witnesses at trial:

- **Christopher MacInnis.** MacInnis was the lead field area manager for GE at the time of trial. In 2011, he began working for GE as a field service technician, a role he kept through 2013. When he began working for GE, he received five weeks' training on wellheads and an additional one week "frac" training. Prior to working for GE, he worked for ten years in the crane and rigging industry, as a crane operator, overhead hoist inspector, and forklift operator. He testified that GE offered a service call "frac watch." For a fee, GE would provide two technicians per shift to watch the frac valve

40

assembly and be available to grease valves or retorque nuts and bolts during fracking operations. MacInnis testified that Carrizo was the only company he was aware of that did not use the frac watch service offered by GE, and he said that using GE's frac watch service was the usual and customary choice of other operators in the area.

- **Manuel Araujo and James Latham.** Araujo and Latham worked for two different gasket manufacturers. Each man testified that he was unaware of his company's product ever failing.

- **Robert Ripple.** Ripple was the senior manager of sales and business development for GE at the time of trial. He has a bachelor's degree in business management. He provided a general quote to Carrizo for equipment and services in the Marcellus Shale play. He testified: "We recommend that our valves are greased and torquing is applied every three stages" during fracking. He testified that he was "confident" that he told Weinstock or his colleague about that recommendation. Ripple testified that some customers request retorquing after every fracking stage. Ripple also said that greasing valves and torquing is on-site maintenance and that customers typically pay for the frac watch service, which includes greasing, onsite personnel, valve operation, and troubleshooting.

- **Christopher Frey.** Frey testified as GE's corporate representative. His educational and professional background was not provided in the limited offer of excerpts from his video deposition admitted at trial. Frey said that torque checking is part of the frac watch service that GE offered to Carrizo, but GE makes no recommendation and gives no written maintenance procedure to customers who rent a frac valve assembly.

- **Scott Hudson.** Hudson is the vice president of drilling and completions for Carrizo. He testified that he worked for Brad Fisher, who asked him to go to Pennsylvania to help secure the Yarasavage 1H well. His educational and professional background was not provided in the limited offer of excerpts from his video deposition that was admitted at trial. He testified that the only maintenance he had ever done on a frac valve assembly was "greasing." He also testified that before the Yarasavage 1H blowout, no lessor of frac valve assemblies had ever told him to do preventive maintenance on the frac valve assemblies during fracking.

41

- **Larry Gerard.** Gerard is an oilfield consultant and who worked for Carrizo as a wellsite supervisor and consultant on the Yarasavage 1H well. He testified that he witnessed the pressure test on the frac valve assembly for the Yarasavage 1H well, and it did not reveal any problems. He also testified that GE never recommended periodic torquing to him or anyone else at Carrizo. He also testified that he had no theory about what caused the blowout, but he did not believe that he or GE did anything wrong.

- **Ben Holgate.** Holgate has a master's degree in mechanical engineering from the University of Illinois and is a professional engineer in Texas. He testified that the API 6A standard covers the manufacture of equipment like the flange used beneath the master valve on the frac valve assembly. He testified about flanges, gaskets, flange seals, torquing on flanges as installed (with and without the use of lubricant), and provided other technical explanations regarding the equipment used. He did not offer an opinion about a standard of care for the inspection or maintenance of the frac valve assembly or whether Carrizo's actions breached the standard of care and caused damages from the blowout. He did testify that he believed the blowout could have been caused by external forces or by loosening of torque on the bolts of the flange, although he explained that this "torque relaxation" typically occurs over a long period of time. Holgate testified that GE had not been able to determine the specific cause of the blowout. In addition, he said that GE first began advising its customers in writing to check torque between fracking stages after the Yarasavage 1H blowout.

- **Dr. Stuart Brown.** Dr. Brown has a PhD in mechanical engineering from MIT. He is the managing principal of an engineering consulting firm that also does simulation, testing, product design, and process improvement. He has experience and training in materials analysis. He belongs to numerous professional societies, holds several patents, and has published papers. He investigated the blowout. Dr. Brown's testimony focused on the flange and the gasket, including the metallurgy and testing he conducted. He concluded that the gasket was compliant with API standards and nothing about the gasket or its installation caused the blowout. Nothing in his testimony identified a standard of care applicable to or breached by Carrizo.

At trial, GE did not offer testimony from a designated expert witness regarding the standard of care that applied to Carrizo and how Carrizo's breach of

42

such standard of care caused the blowout. On appeal, to establish a standard of care, GE relies on a variety of non-expert testimony, such as testimony from Ripple, GE's sales and business development manager, that GE recommended its customers purchase an add-on service for onsite frac watching. "When expert testimony is required, lay evidence supporting liability is legally insufficient." *AKIB Constr.*, 582 S.W.3d at 803.

GE also argues that Carrizo had not assigned anyone the task of watching the frac valve assembly because Beny could not identify by name the person who did that job. But Beny and others testified that watching the frac valve assembly was contracted to Baker Hughes, and Beny testified that no Baker Hughes employees were deposed. GE also argued that Beny testified that periodic torque checking was "a necessary activity." To the contrary, what Beny said was that, during the three weeks of fracking before the blowout, when a Baker Hughes employee or Carrizo roustabout noticed a loose bolt or nut, he would tighten it with a hammer wrench. He said that torque wrenches, which were necessary to check the torque, were not used. Beny also said that nobody used a hammer wrench on the nuts and bolts holding together the API 6A flange, which failed during the blowout. GE's reliance on out-of-context testimony from Beny is not legally sufficient. *See City of Keller*, 168 S.W.3d at 812 ("More generally, evidence

43

cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did.").

Having considered the evidence, we conclude that GE failed to prove by expert testimony that Carrizo breached a standard of care applicable to oil and gas operators and that such breach caused the damages from the blowout. *See Gharda*, 464 S.W.3d at 347. We hold that the trial court did not err by granting Carrizo's motion to disregard the jury's answers to the questions about Carrizo's negligence.

We overrule the second issue.

## III. The trial court properly refused GE's claim for indemnity.

In its third issue, GE argues that it is entitled to enforce a contractual first-party indemnity provision. First, GE argues that Carrizo authorized Weinstock and the wellsite supervisors to accept the indemnity provisions because it authorized Weinstock to negotiate and contract for the rental of frac valve assemblies and it authorized the wellsite supervisors to sign FSOs. Second, GE argues that the trial court erred by concluding that the indemnity provisions did not satisfy the fair notice requirements that apply to first-party indemnity provisions. Third, GE argues that the trial court's findings of fact and conclusions of law regarding unconscionability and failure of consideration are erroneous. Thus, GE asserts that this Court should render judgment in its favor on its contractual indemnity claim, including attorney's fees and costs.

44

We disagree. GE had the burden of proof to demonstrate that the parties had an enforceable contract for first-party indemnity. In its brief, GE repeatedly refers generally to contractual indemnity provisions. In this case, there was no master service agreement between GE and Carrizo. Consequently, the relevant contractual provisions appear in four types of documents: (1) a January 2012 quote for materials and services, (2) invoices, (3) order verification reports ("OVR"), and (4) field service orders ("FSO"). While all four documents include indemnity provisions, only the FSOs included an express first-party indemnity provision. The quote, the invoices, and the OVRs cannot support enforcement of first-party indemnity under the express negligence test of the fair notice rule.

In addition, whether the wellsite supervisors who signed the FSOs had actual or apparent authority hinges on the determination of certain factual matters. In its findings of fact, the trial court found that the FSOs were signed by Carrizo's wellsite supervisors solely to confirm receipt of goods and services. The court also found that Carrizo did not authorize the wellsite supervisors to negotiate or approve a first-party indemnity agreement with GE, and Carrizo did not tell GE or the wellsite supervisors that they had that authority. Our standard of review requires us to respect and defer to these fact findings because they are supported by sufficient evidence. Therefore, the first-party indemnity provision in the FSOs is

unenforceable because the wellsite supervisors who signed them had no authority to bind Carrizo to provide first-party indemnity to GE.

## A. Standards of review

"We construe indemnity agreements under normal rules of contract construction." *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex. 2000). "The primary goal is to ascertain and give effect to the parties' intent as expressed in the contract." *Id.* "Whether a contract is ambiguous is a question of law for the court to decide." *Id.* (citing *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)). "When the contract is worded so that it can be given a certain or definite legal meaning[,] it is not ambiguous, and the court will construe the contract as a matter of law." *Id.* (citing *Coker*, 650 S.W.2d at 393).

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the sufficiency of the evidence supporting those findings by using the same standards to review jury verdicts. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009) (citing *City of Keller* and stating that "[t]he same standard of review applies to a trial court's findings following a bench trial"); *AKIB Constr.*, 582 S.W.3d at 805. We review a trial court's conclusions of law de novo. *BMC Software*, 83 S.W.3d at 794.

## B. Indemnity

An indemnity agreement is a promise to safeguard or hold the indemnitee harmless against either existing [or] future loss or liability, or both. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). "Ordinarily, an indemnity provision does not apply to claims between the parties to the agreement; instead, it obligates the indemnitor to protect the indemnitee against claims brought by third parties." *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied); *accord Claybar v. Samson Expl., LLC*, No. 09-16-00435-CV, 2018 WL 651258, at *2 (Tex. App.—Beaumont Feb. 1, 2018, pet. denied) (mem. op.); *Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 143–44 (Tex. App.–Fort Worth 2010, no pet.) (op. on reh'g); *Ganske v. Spence*, 129 S.W.3d 701, 708 (Tex. App.—Waco 2004, no pet.); *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 20 S.W.3d 119, 129–30 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). In *Ganske*, the court of appeals noted, however, the possibility that an indemnity provision could be written so that the parties indemnify each other against claims they later assert against each other. *Ganske*, 129 S.W.3d at 708.

Because indemnity provisions seek to shift the risk of one party's future negligence to the other party, Texas imposes a fair notice requirement before enforcing such agreements. *Dresser Indus.*, 853 S.W.2d at 508; *Cabo Constr., Inc.*

47

*v. R S Clark Const., Inc.*, 227 S.W.3d 314, 317 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Fair notice is comprised of the express negligence doctrine and the conspicuousness requirement. *Dresser Indus.*, 853 S.W.2d at 508. The express negligence doctrine requires that "the intent of the parties must be specifically stated within the four corners of the contract." *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *see Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004). The conspicuousness requirement requires that "something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it." *Dresser Indus.*, 853 S.W.2d at 508 (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)). "Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself." *Storage & Processors*, 134 S.W.3d at 192. Although conspicuousness is based on the existence of facts, the Supreme Court of Texas has held that a determination of whether an agreement meets the conspicuousness requirement is a question of law for the court. *Dresser Indus.*, 853 S.W.2d at 509; *Cabo Constr.*, 227 S.W.3d at 317.

## C.    Indemnity provisions in the four types of documents.

In their briefs, both GE and Carrizo appear to conflate the indemnity provisions found in the four relevant types of documents. At oral argument, both

GE and Carrizo mentioned that they are not identical, and we have noted that the FSO has a differently-worded indemnity provision. We begin by examining the text of the indemnity provisions in the four types of documents.

### 1.    January 2012 quote

The first relevant document is the January 2012 GE quote for rental of frac valve assemblies for the Marcellus Shale project. This quote was an itemized list of materials and services. Beneath the itemized list, on page 5 of 5, and in smaller font, is a caveat about equipment specification and a statement incorporating by reference GE's "Terms and Conditions of Sale":

> The equipment offered by GE Oil & Gas Pressure Control fully meets all requirements of the specifications stated in the Equipment Descriptions, including API 6A PSL Levels, with any exceptions noted. GE Oil & Gas Pressure Control offers equipment to meet 1. Customer specification or 2. Market practice, which may not follow the recommended Product Specification Level (PSL) selection, as suggested in API 6A 19[th] Edition, Annex A. **This quotation, and any sale resulting therefrom, is subject to Buyers Acceptance of GE Oil & Gas Pressure Control's Terms and Conditions of Sale, a copy of which is attached or can be made available to Buyer upon request.** Any terms and conditions included with Buyer's order which are in any way in conflict or inconsistent with GE Oil & Gas Pressure Control's Terms and Conditions of Sale shall not be binding on GE Oil & Gas Pressure Control unless expressly agreed to in writing. Terms subject to credit approval.

> (Emphasis added.)

GE's standard terms and conditions were printed on the next page, and included:

49

**LIMITATIONS OF LIABILITY.** THE TOTAL LIABILITY OF SELLER ON ANY CLAIM WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE WHETHER SOLE OR CONCURRENT) OR OTHERWISE ARISING OUT OF, CONNECTED WITH, OR RESULTING FROM THE PERFORMANCE OR NON-PERFORMANCE OF THE CONTRACT, THE PRODUCTS AND/OR THE SERVICES SHALL NOT EXCEED THE PRICE RECEIVED BY THE SELLER AND ALLOCABLE TO THE PRODUCT OR PART THEREOF, OR THE COST OF FURNISHING OF ANY SERVICE WORK, WHICH GIVES RISE TO THE CLAIM.

NOTWITHSTANDING ANY PROVISION TO THE CONTRARY ELSEWHERE, IN NO CASE WILL SELLER BE LIABLE FOR CONSEQUENTIAL LOSS AND BUYER SHALL SAVE, INDEMNIFY, DEFEND AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL CONSEQUENTIAL LOSS EVEN IF CAUSED BY SELLER'S SOLE, JOINT, COMPARATIVE, CONTRIBUTORY OR CONCURRENT NEGLIGENCE, FAULT, STRICT LIABILITY OR PRODUCT LIABILITY, AND REGARDLESS OF THE FORM OF ACTION, WHETHER CONTRACT, TORT (INCLUDING NEGLIGENCE), BREACH OF WARRANTY, INDEMNITY, STATUTE, STRICT LIABILITY OR OTHERWISE.

"Consequential Loss" shall mean (whether or not foreseeable at the date of the contract): any and all consequential, indirect, special, incidental, exemplary or punitive loss or damage; including, but not limited to loss of production, product, goodwill, use, revenue, profit (or anticipated profit), and cost of capital, in each case whether direct or indirect, and claims for service interruption, costs and expenses incurred in connection with substitute facilities or supply sources and in connection with the removal and replacement of products or reperformance of the services. The Buyer acknowledges that the provisions of this Clause are reasonable and reflected in the Contract price, which would be higher without those provisions and the Buyer accepts such risks and will insure accordingly.

**8 INDEMNITIES.** 8.1 Subject to 8.2, the **Buyer and Seller shall each be responsible for and shall save, indemnify, defend and hold**

**harmless the other's Group from and against all claims**, losses, damages, costs (including legal costs), expenses, **and liabilities in respect of, personal injury including death or disease or loss of or damage to the property of any third party** to the extent that any such injury, loss or damage is caused by the negligence or breach of duty (whether statutory or otherwise) of the respective Buyer or Seller or their Groups.

8.2 Notwithstanding Section 8.1, Buyer shall be liable for, and shall defend, indemnify and hold Seller Group harmless from and against, any and all claims which arise out of the performance or non-performance of the Contract in relation to the following, and whether or not resulting from, or contributed to by, the negligence of Seller Group; (i) loss of or damage to any well or hole or any third party oil and gas production facilities; (ii) reservoir seepage or pollution originating underground or from the property of the Buyer or third party howsoever arising; (iii) blow-out, fire, explosion, cratering of any well or reservoir or any other uncontrolled well condition (including the costs to control a wild well and the removal of debris); (iv) damage to or escape of product, or substance from any facility including any pipeline or other subsurface facility.

(Emphasis added.)

## 2. Invoices

Unlike the January 2012 quote, the front of the invoices does not include any reference to any terms or conditions. There is no indication that anything was printed on the back of the invoices. Instead, a copy of GE's "Standard Terms and Conditions of Sale" was attached to the invoices as a second page. The indemnity language was identical to the indemnity language in the Standard Terms and Conditions attached to the January 2012 quote.

### 3. OVRs

The OVRs were like the invoices. Nothing on the front of the OVRs referenced any terms or conditions. Like the invoices, GE's "Standard Terms and Conditions of Sale" was attached as the last page. The indemnity language was identical to the indemnity language in the Standard Terms and Conditions attached to the January 2012 quote and the invoices.

### 4. FSOs

The FSOs were different from the quote, the invoices, and the OVRs. The top of the form stated:

GE Oil & Gas Pressure Control, LP
FIELD SERVICE ORDER
TERMS & CONDITIONS OF SALE

Below the words "Terms & Conditions of Sale" and in a smaller font than used elsewhere on the document, was the statement: "Sale of any products or services is conditioned on Customer's agreement to the Terms & Conditions on the reverse side hereof."

The body of the document was a fill-in-the-blank form detailing equipment, materials, and services provided. At the bottom of the form, above signature lines for the "GE Technician" and "Company or Contractor," was the following statement, which was in bold typeface:

THIS AGREEMENT CONTAINS PROVISIONS RELATIVE TO INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF

RISK. Authorizing the work and acknowledging that, absent a master or other controlling agreement between parties, the Terms & Conditions on the reverse hereof shall apply to the work described herein. BY SIGNING THIS DOCUMENT CUSTOMER AGREES THESE TERMS & CONDITIONS ARE THE EXCLUSIVE TERMS & CONDITIONS APPLICABLE TO THIS TRANSACTION.

"Terms and Conditions of Service" were printed on the back of the FSO.

These were different from GE's "Standard Terms and Conditions of Sale."

## TERMS AND CONDITIONS OF SERVICE

As used herein, "Contractor" refers to GE Oil & Gas, and "Customer" refers to the party requesting services from Contractor.
NOTICE: Sale or Lease of any products or services is expressly conditioned on Customer's assent to these Terms and Conditions. THIS DOCUMENT CONTAINS REGARDLESS OF FAULT RELEASE AND INDEMNITY PROVISIONS.

. . . .
## LIABILITY AND INDEMNITY

Customer agrees to release, defend, indemnify and hold harmless Contractor, its divisions, subsidiaries, parent and affiliated companies and the officers, directors, employees, agents and servants of all of them from and against any claims, liability, expenses, attorney fees and costs of defense, to the extent permitted by law, *whether asserted directly by Customer or by a third party;* for: (1) damage to property owned by, in the possession of, or leased by Customer and/or the well owner (if different from Customer), including surface and subsurface damage (the term "well owner" shall include working and royalty interest owners); (2) reservoir, formation and well loss or damage, subsurface trespass or any action in the nature thereof; (3) personal injury, death or property damage or any claims or damages whatsoever growing out of or in any way connected with or resulting from pollution, fire, explosion, subsurface pressure, losing control of a well, and /or a well blowout or the use of radioactive material or clean-up or remediation. **The defense indemnity, release and hold harmless obligations of Customer provided for above apply to claims or liability even if contributed**

53

**to or caused by the sole, joint or concurrent negligence, fault, strict liability or product liability of Contractor . . . or any defect in the data, product, supplies, materials or equipment of Contractor whether in the preparation, design, manufacture, maintenance, distribution or marketing thereof, or from failure to warn any person of such defect.** Such defense, indemnity, release and hold harmless obligations of Customer shall not apply to the extent the claims or liability, are caused by the gross negligence or willful misconduct of Contractor.

The indemnification provided above shall only be effective to the maximum extent permitted by law. The parties agree that in the event any law is enacted in any state, the laws of which govern this contract, that limit in any way extent to which indemnification may be provided to an indemnitee, that this contract shall automatically be amended to provide that the indemnification provided hereunder shall extend only to the maximum extent permitted by applicable law.

(Emphasis in original.)

**D.    Only the FSO indemnity provision satisfies the fair notice requirement.**

The indemnity provision associated with the quote, the invoice, and the OVRs was broad, but it did not expressly state that it applied to first-party claims. Under our normal rules of contract construction, we cannot conclude that the parties expressed an intent that Carrizo would provide GE with first-party indemnity based on GE's Standard Terms and Conditions of Sale. *See Gulf Ins. Co.*, 22 S.W.3d at 423. In addition, because of the heightened consequences of liability shifting through a first-party indemnity clause, we must also consider whether the indemnity provision at issue satisfies the fair notice requirement. *See Dresser Indus.*, 853 S.W.2d at 508; *Cabo Constr.*, 227 S.W.3d at 317. The first

54

component of the fair notice requirement—the express negligence test—is not satisfied by the indemnity provision in GE's Standard Terms and Conditions of Sale. *See Ethyl Corp.*, 725 S.W.2d at 708. Unlike the "Terms and Conditions of Service" that was attached to the FSOs, GE's Standard Terms and Conditions of Sale did not expressly state an intention to provide first-party indemnification within the four corners of the document. *See id.* Accordingly, the indemnity provision associated with the January 2012 quote, the invoices, and the OVRs fails to satisfy the express negligence doctrine and the fair notice requirement. *See Dresser Indus.*, 853 S.W.2d at 508; *Ethyl Corp.*, 725 S.W.2d at 708. GE is not entitled to first-party indemnity from Carrizo based on the indemnity provision in these documents.

As we have said, however, the FSOs are different. The FSOs, including the FSO for installation of the frac valve assembly for the Yarasavage 1H well, expressly stated that the indemnity provision extended to all claims "*whether asserted directly by Customer or by a third party*." The trial court concluded, as a matter of law, that the indemnity provision on the back of the FSO does not meet the express negligence test. We disagree with this conclusion. The statement— *whether asserted directly by Customer or by a third party*—expresses an intent for Carrizo to provide GE with first-party indemnification. *See Ethyl Corp.*, 725 S.W.2d at 707. This language satisfies the express negligence test. *See id.*

55

The second part of the fair notice test is conspicuousness. *See Dresser Indus.*, 853 S.W.2d at 508. In this case, the trial court issued findings of fact and conclusions of law relevant to the conspicuousness requirement:

- "The field services order is two-sided. The indemnity provision is on the back side of the field services order. The document is thin, and the entire indemnity provision is in very small font, regular typeface, and not capitalized."

- "The indemnity provisions on the back side of the field services order is not conspicuous, does not meet the express negligence test, and is unenforceable."

We again disagree with the trial court. Although the FSO is thin, as evidenced by the bleed-through of a company ink-stamp used by field personnel, this document includes two references to the indemnity provision on its face. First, a statement at the top of the page states: "Sale of any products or services is conditioned on Customer's agreement to the Terms & Conditions on the reverse side hereof." The font is small, and the typeface is normal. Second, a notice appears on the bottom of the front side of the FSO, immediately above the signature line. This notice is in bold typeface, and some of the words are capitalized.[7]

---

[7]

THIS AGREEMENT CONTAINS PROVISIONS RELATIVE TO INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK. Authorizing the work and acknowledging that, absent a master or other controlling agreement between parties, the Terms & Conditions on the reverse hereof shall apply to the work described herein. BY SIGNING THIS DOCUMENT CUSTOMER AGREES THESE TERMS & CONDITIONS ARE THE EXCLUSIVE TERMS & CONDITIONS APPLICABLE TO THIS TRANSACTION.

The "Terms and Conditions of Service" on the back of the FSO is printed in a single column that is the width of the page, and the font is the same size or larger than that used on the front of the FSO. At the top of the back side, there is a notice, which states in all capitals that the document contains "regardless of fault release and indemnity provisions."[8] The "liability and indemnity" provisions constitute two paragraphs. A heading stating "LIABILITY AND INDEMNITY" appears immediately above the paragraphs in bold typeface, underlined, and in a slightly larger font. Some of the words in the paragraphs are highlighted with bold typeface, underlining, and italics.

We conclude that the indemnity provision on the FSOs is conspicuous. *See Dresser Indus.*, 853 S.W.2d at 508–11. The FSO included a statement on the top of the front of the page that specifically referred to the terms and conditions printed on the back of the document. *See id.* at 511. A second statement appeared at the bottom just above the signature line and referred to the terms and conditions, including the indemnity provisions printed on the reverse side. *See id.* The indemnity provision on the back appears in a paragraph clearly labeled "liability and indemnity," in bold underlined text, and the specific provision is not

---

[8]

TERMS AND CONDITIONS OF SERVICE

As used herein, "Contractor" refers to GE Oil & Gas, and "Customer" refers to the party requesting services from Contractor. NOTICE: Sale or Lease of any products or services is expressly conditioned on Customer's assent to these Terms and Conditions. THIS DOCUMENT CONTAINS REGARDLESS OF FAULT RELEASE AND INDEMNITY PROVISIONS

surrounded by completely unrelated terms. *See id.* The specific provision for first-party indemnity is further highlighted by italicized print. Accordingly, we conclude that the provision was conspicuous. *See Storage & Processors*, 134 S.W.3d at 192 ("Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself."); *see also* TEX. BUS. & COM. CODE § 1.201(b)(10) (defining conspicuous as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it"). We hold that the first-party indemnity provision in the FSOs satisfies the fair notice test.

## E. The FSOs were not signed by people who had authority to bind Carrizo to a first-party indemnity provision.

We have concluded that the first-party indemnity provision satisfied the fair notice test, but this conclusion does not end our inquiry into whether GE was entitled to enforce that provision. The remaining question is whether GE proved that Carrizo agreed to the first-party indemnity provision. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Contracts require mutual assent to be enforceable. . . . Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). GE and Carrizo do not dispute the existence of a general, third-party indemnity agreement arising from the quote and the invoices. The question is whether Carrizo is obligated to provide first-party indemnity because their independent contractors in

the field signed FSOs that included the first-party indemnity provision on the back. The answer to this question depends on the determination of certain factual matters. The trial court made findings of fact about the nature and purpose of the FSOs and about the authority of Weinstock and the wellsite supervisors to accept a first-party indemnity requirement on behalf of Carrizo.

On appeal, GE argues that the trial court erred by finding that no person with authority assented to "the agreement" on Carrizo's behalf. In making this argument, GE refers generally to the "contract" or "agreement" without differentiating among the four types of documents at issue in this case. GE does not expressly challenge the sufficiency of the evidence to support the trial court's findings of fact, although it does argue that the court's finding that Carrizo did not authorize Weinstock or its wellsite supervisors "to negotiate contract terms with its vendor or to bind Carrizo to an indemnity agreement" is "contrary to the undisputed evidence." Appellant's Br. 44.

### 1. Findings of fact

Our standards of review require us to defer to the trial court's fact findings when they are supported by sufficient evidence. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). Here, the trial court's relevant fact findings are supported by the record.

## The nature and purpose of the FSOs

The trial court made the following fact findings relevant to the nature and purpose of the FSOs:

- "[GE] provided equipment and services to Carrizo and presented "field services orders [FSOs]," and other documents that were admitted into evidence at the bench trial.

- "The field services orders [FSOs] . . . were stamped and required a signature for the sole purpose of confirming receipt of equipment and services."

- "Carrizo's [wellsite supervisors] signed the stamped field services orders . . . solely to confirm receipt of GE's equipment and services."

- "Coleby Weinstock, a district engineer for Carrizo, approved payment for equipment and services. Carrizo electronically received invoices from GE. Weinstock electronically received a scanned copy of the front pages of an invoice that did not include any terms and conditions. Weinstock reviewed the uploaded invoice and approved or rejected payment of the uploaded invoice."

The evidence showed that Weinstock selected GE to supply material and services based, in part, on the January 2012 quote. Having selected GE, Carrizo placed orders that GE fulfilled. Carrizo established a procedure to verify what materials and services were provided and to enable Carrizo to approve payment. When materials or services were supplied by any vendor, the procedure was for the vendor to present a document to the wellsite supervisor onsite after the material was delivered or the services completed. These documents were the OVRs and the

60

FSOs. When the wellsite supervisor received an FSO or OVR, he would mark it using a stamp provided by Carrizo that imprinted a small form for the wellsite supervisor to fill in.[9] Using the form created by the stamp, the wellsite supervisor recorded the date, a description of the services performed, the cost, whether there was a dispute about the costs, labor, or materials, and other codes relevant to Carrizo's internal administration and payment of invoices. The wellsite supervisor also signed in the stamped box. Most of the OVRs and FSOs admitted at trial had the stamp and a wellsite supervisor signature in the stamped area. A few OVRs and FSOs were signed at the bottom on the preprinted line just below the text about terms and conditions.

At the bench trial on indemnity, the court heard live testimony from Weinstock and admitted excerpts of depositions of Weinstock, GE field service technicians Devon Feaster and Christopher MacInnis, GE field manager Chris Frey, Carrizo's vice president and chief operating officer Brad Fisher, Carrizo's

---

[9]

| MATERIALS FURNISHED | | | | | |
|---|---|---|---|---|---|
| QUANTITY | Carrizo Marcellus, LLC | | DESCRIPTION | | UNIT PRICE |

general counsel Larry Kennington, wellsite supervisor Larry Gerard, and GE contracts manager April Jones. Jones testified that she worked in the office and did not go to the field. She said that GE only works with customers after the customers agree to a master service agreement or the terms and conditions in the OVRs and FSOs. But she was surprised to learn that OVRs and FSOs are presented to the customer only after the materials have been supplied and work has been completed. In contrast to Jones's testimony, Weinstock, Feaster, MacInnis, Frey, Gerard, Fisher, and Kennington all testified that the FSOs were used to verify that the work had been completed onsite. They all testified that this was used for the purpose of invoices and billing. Weinstock testified that he received electronically a copy of the front pages of the OVRs and FSOs with the invoices from GE. But he testified that he did not approve the OVRs or FSOs. He used the information on the OVRs and FSOs to determine whether to approve the charges in the invoices sent by GE or to refer a charge for resolution of a dispute about labor, materials, or pricing.

The trial court's findings of fact regarding the FSOs are supported by legally sufficient evidence because the evidence adduced at trial would enable reasonable and fair-minded people to reach the findings of fact under review. *See City of Keller*, 168 S.W.3d at 827. These findings of fact are also factually sufficient because, having considered the appellate record in a neutral light, we conclude that

these fact findings are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We therefore defer to these fact findings. *See Italian Cowboy Partners*, 341 S.W.3d at 337.

**The authority of Weinstock and the wellsite supervisors**

The trial court made the following fact findings relevant to the authority that Weinstock and the wellsite supervisors had to act on behalf of Carrizo:

- "Carrizo did not authorize its [wellsite supervisors] or Coleby Weinstock to negotiate contract terms with its vendors or to bind Carrizo to an agreement requiring Carrizo to indemnify GE for GE's own negligence. Carrizo did not authorize its [wellsite supervisors] or Coleby Weinstock to bind Carrizo to indemnify contractors or to negotiate or agree to the terms of any indemnity contracts. Neither negotiating nor agreeing to such indemnity provisions was necessary for the [wellsite supervisors] and/or Weinstock to perform their work for Carrizo or interact with GE."

- "Carrizo did not knowingly permit its [wellsite supervisors] or Coleby Weinstock to hold themselves out as having authority to execute indemnity agreements on behalf of Carrizo. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Carrizo never told the [wellsite supervisors] or Coleby Weinstock they possessed any authority to approve and bind Carrizo to indemnity agreements. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock."

- "Carrizo never told GE the [wellsite supervisors] or Coleby Weinstock had authority to approve and bind Carrizo to indemnity agreements. Carrizo did not grant such authority to its [wellsite supervisors] or to Coleby Weinstock. A reasonably

63

prudent person would not rely on any conduct by or apparent authority of the [wellsite supervisors] men or Coleby Weinstock to bind Carrizo to indemnity agreements."

The record shows that the FSOs were signed by Gerard and Weller, the wellsite supervisors. Kennington testified that both Gerard and Weller were independent contractors, whose contracts prohibited them from being deemed an employee, agent, or representative of Carrizo. Accordingly, neither Gerard nor Weller had authority to enter a contract with GE on behalf of Carrizo.

Weinstock testified that he had authority to bid out the job and to make purchases up to $150,000. He said that he was authorized by Carrizo to enter into the contract, which he considered to be the January 2012 quote along with the invoices. But he said that negotiating legal terms was not his "authority," so he paid no attention to the terms and conditions on the FSO or invoice. He also said that he never saw the terms and conditions on the back of the FSO. Consequently, he never brought the change in indemnity language that appeared in the FSO's terms and conditions to the attention of Carrizo's legal department.

GE's field service technicians and field manager testified that they did not have authority to negotiate legal terms and conditions and they never discussed them with the wellsite supervisors. Regarding the terms and conditions on the FSOs, Frey said: "We're all oil field hands. We–we don't know that." While Frey testified that Gerard never told him that he did not have authority to sign an FSO,

Frey said he was not sure whether a wellsite supervisor had authority to enter into contracts for the company for which he works. Gerard testified that the legal meaning of the FSO's terms and conditions was "outside my area."

We conclude that the evidence is legally and factually sufficient to support the trial court's findings of fact that Carrizo did not authorize the wellsite supervisors to enter contracts on behalf of Carrizo. Nor did Carrizo communicate to the wellsite supervisors or to GE that they had that authority. *See City of Keller*, 168 S.W.3d at 827; *Cain*, 709 S.W.2d at 176. We therefore defer to these fact findings. *See Italian Cowboy Partners*, 341 S.W.3d at 337.

## 2. Agency, authority, and ratification

With deference to these fact findings, we apply the law to the facts of this case. "An agent is one authorized by another to transact some business for the principal; the relationship is a consensual one between two parties, by which one party acts on behalf of the other, subject to the other's control." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782–83 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Jamison v. Nat'l Loan Invs.*, 4 S.W.3d 465, 468 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)). Texas courts do not presume that an agency relationship exists, and the party who alleges it has the burden of proving it. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 697–98 (Tex. 2017) (citing *IRA Res., Inc. v. Griego*, 221 S.W.3d 592,

597 (Tex. 2007)). A principal is liable for the acts of its agent only when the agent has actual or apparent authority to do those acts. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007). "An agent's authority to act on behalf of a principal depends on some communication by the principal either to the agent (actual or express authority) or to the third party (apparent or implied authority)." *Id.* "Because an agent's authority is presumed to be co-extensive with the business entrusted to his care, it includes only those contracts and acts incidental to the management of the particular business with which he is entrusted." *Id.* at 185.

"Actual authority is authority that the principal intentionally conferred on the agent or allowed the agent to believe was conferred." *Kettrick v. Coles*, No. 01-10-00855-CV, 2011 WL 3820941, at *9 (Tex. App.—Houston [1st Dist.] Aug. 25, 2011, pet. denied) (mem. op.). "Actual authority includes both express and implied authority and 'usually denotes that authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe that he possesses, or (3) allows the agent to believe that he possesses by want of due care.'" *Id.* (quoting *Spring Garden 79U, Inc. v. Stewart Title Co.*, 874 S.W.2d 945, 948 (Tex. App.—Houston [1st Dist.] 1994, no writ). Implied actual authority is an "adjunct" to express actual authority, "because implied authority is that which is proper, usual, and necessary to the exercise of the authority that the principal expressly delegates." *Id.* (quoting *Spring Garden 79U*, 874 S.W.2d at 948).

Apparent authority arises "either from a principal knowingly permitting an agent to hold [himself] out as having authority or by a principal's actions that lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he] purports to exercise." *Id.* (quoting *Baptist Mem. Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 948 (Tex. 1998)). "[A]pparent authority must be based on the acts of the principal" and "is limited to the scope of responsibility that is apparently authorized." *Gaines*, 235 S.W.3d at 184 (quoting *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004)). Mere declarations of an alleged agent, standing alone, are "incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." *Gaines*, 235 S.W.3d at 183–84. "Because apparent authority is an estoppel principle, a party seeking to recover under such legal theory must show justifiable reliance on the principal's words or conduct resulting in harm to the party." *See Reliant Energy Servs.*, 336 S.W.3d at 784. The standard courts employ when evaluating the reasonableness of a third party's assumptions about apparent authority "is that of a reasonably prudent person, using diligence and discretion to ascertain the agent's authority." *See Gaines*, 235 S.W.3d at 182–83 (citing *Chastain v. Cooper & Reed*, 257 S.W.2d 422, 427 (Tex. 1953)); *see also Reliant Energy Servs., Inc.*, 336 S.W.3d at 787 ("'[R]easonable diligence to ascertain [an] agent's authority' is part of the standard

under Texas law for determining whether a person is 'reasonably prudent' in the context of apparent authority . . . .") (quoting *Gaines*, 235 S.W.3d at 182–83).

In this case, GE is asserting the existence of a contract based on acceptance of the FSO terms and conditions by the wellsite supervisors. Therefore, GE had the burden to prove at trial (as well as on appeal) that the wellsite supervisors had actual or apparent authority by which they could act and bind Carrizo.

The findings of fact (and evidence at trial) establish that neither wellsite supervisor had express actual authority to bind Carrizo to contractual terms or negotiate any legal provisions. The FSOs were signed not as a contract to perform in the future but as a business record memorializing work that had already been done. Evidence from witnesses for both GE and Carrizo established that this was understood by both parties. The fact findings and evidence also demonstrate that the power to negotiate, renegotiate, or accept a more burdensome liability-shifting, first-party indemnity provision was not necessary to the exercise of the authority expressly delegated to the wellsite supervisors to manage the operations in the field. None of the GE service technicians or the field manager believed that the wellsite supervisors had such authority, nor did Gerard believe that he did. To the contrary, the evidence supporting the trial court's fact findings establishes that neither the GE employees or wellsite supervisors believed that negotiation of or

understanding the legal terms was in any way part of the wellsite supervisors' responsibility.

The evidence supporting the trial court's fact findings likewise does not support a conclusion that the wellsite supervisors had apparent authority. There was no evidence that Carrizo communicated to GE that the wellsite supervisors had the authority to assent to a contract on behalf of Carrizo. Instead, the evidence showed that the wellsite supervisors had the authority to work within the parameters of the contract negotiated by Weinstein by virtue of the quote and as evidenced by the invoices that Carrizo paid. There was also no evidence that GE made any inquiry–let alone acted with reasonable diligence and discretion—to determine whether the wellsite supervisors had authority to agree to a first-party indemnity provision when all the other documents comprising the contract between GE and Carrizo included only a third-party indemnity provision.

We conclude that the trial court correctly held that the wellsite supervisors did not have actual (express or implied) or apparent authority to bind Carrizo to the terms and conditions on the back of the FSO. *See Kettrick*, 2011 WL 3820941, at *9.

Finally, GE challenges the trial court's conclusion that Carrizo did not ratify the first-party indemnity provision on the back of the FSO by paying the invoices GE submitted. We agree with the trial court.

69

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021). Ratification "is but an agreement, express or implied, by one to be bound by the act of another performed for him." *Id.* (quoting *Dillingham v. Anthony*, 11 S.W. 139, 142 (Tex. 1889)); *see Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 744 (Tex. App.—Houston [1st Dist.] 1981, no writ) ("There can be no ratification of an act which is not done in behalf of, and does not purport to bind, the person against whom the doctrine of ratification is invoked.").

Ratification can be express or implied. *BPX Operating Co.*, 629 S.W.3d at 197. "Express ratification—in writing, for example—typically makes the parties' intentions clear." *Id.* A party claiming implied ratification must offer objective evidence of intent, such as a party's conduct. *Id.*; *see Mo. Pac. R.R. v. Lely Dev. Corp.*, 86 S.W.3d 787, 792 (Tex. App.—Austin 2002, pet. dism'd) ("Ratification may be inferred by a party's course of conduct and need not be shown by express word or deed."). "As with most objective inquiries, determining a party's objective intent requires an examination of 'the totality of the circumstances.'" *BPX Operating Co.*, 629 S.W.3d at 197 (quoting *State v. One (1) 2004 Lincoln Navigator*, 494 S.W.3d 690, 706 (Tex. 2016) (Devine, J., concurring)). "[I]mplied ratification should be found only if the party's actions 'clearly evidenc[ed] an

70

intention to ratify.'" *BPX Operating Co.*, 629 S.W.3d at 197 (quoting *Chrisman v. Electrastart of Hous., Inc.*, No. 14-02-00516-CV, 2003 WL 22996909, at *5 (Tex. App.—Houston [14th Dist.] Dec. 23, 2003, no pet.) (mem. op.)).

GE has not identified any evidence that Carrizo expressly ratified the first-party indemnity provision on the back of the FSOs. Thus, it was GE's burden to prove implied ratification by providing clear evidence that Carrizo intended to ratify this provision. GE has not done that. Weinstock testified that he reviewed the FSOs and the information included with the company stamp for the purpose of determining whether the charges should be paid. He testified that he did not approve the FSOs, which were used to memorialize facts about what happened in the field. Weinstock's recommendations to pay and Carrizo's payment of the invoices is fully consistent with the other documents that comprise the parties' contract—the quote, the invoices, and the OVRs. These three types of documents used GE's Standard Terms and Conditions that included only the third-party indemnity provisions. GE has failed to prove that Carrizo had any intent to ratify the first-party indemnity provision. Accordingly, we conclude that Carrizo did not impliedly ratify the first-party indemnity provision printed on the back of the FSOs. *See BPX Operating Co.*, 629 S.W.3d at 197.

\* \* \*

Only the terms and conditions that accompanied the FSOs included the first-party indemnity provision. Though the FSO satisfies the fair notice test, GE's indemnity argument fails for a much more fundamental reason: there was never a meeting of the minds. *See Baylor Univ.,* 221 S.W.3d at 635 (holding that contracts require mutual assent to be enforceable); *see also David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract.").

We overrule GE's third issue.

## Conclusion

Having overruled GE's issues, we affirm the judgment of the trial court.

Peter Kelly
Justice

Panel consists of Chief Justice Adams, and Justices Kelly and Goodman.